UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-25041-CIV-GAYLES/OTAZO-REYES

ALBERTO HERNANDEZ,

      Plaintiff,

v.

ANDREW SAUL,
Commissioner for Social Security
Administration,

      Defendant.

_____ /

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court upon Plaintiff Alberto Hernandez's ("Claimant") Motion for Summary Judgment and Memorandum of Law in Support of Motion for Summary Judgement (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 17] and Defendant Andrew Saul, Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment With Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 22].  The administrative transcript (hereafter, "TR.") has been filed [D.E. 11].[1]  For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

---

[1] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

## PROCEDURAL HISTORY

Claimant filed an application for supplemental security income ("SSI") on November 29, 2016.  TR. 182.  The application was denied initially and upon reconsideration.  Id. at 10.  Upon Claimant's written request, a hearing was held on October 23, 2018, before Administrative Law Judge James Cole Cartledge ("ALJ Cartledge"), at which Claimant and Vocational Expert Daniel L. Simone ("VE Simone") testified.  Id. at 31-53.  On December 11, 2019 ALJ Cartledge issued an Unfavorable Decision, finding the following:

(1) Claimant had not engaged in substantial gainful activity since November 29, 2016, the application date (20 C.F.R. § 416.971 et seq.).  Id. at 21.

(2) Claimant had the following severe impairments: diabetes mellitus, peripheral neuropathy, anxiety disorder and major depressive disorder with psychosis (20 C.F.R. § 416.920(c)).  Id.

(3) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).  Id. at 13.[2]

(4) Claimant had the residual functional capacity (hereafter, "RFC") to perform medium work with certain restrictions.[3]

(5) Claimant was unable to perform any past relevant work (20 C.F.R. § 416.965).  Id. at 27.[4]

(6) Claimant was born on May 10, 1962 and was 54 years old, which was defined as an individual closely approaching advanced age, on the date the application

[2] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 416.925(a).
[3] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite the claimant's limitations or impairments.  20 C.F.R. § 416.945(a)(1).  The RFC must be determined based on all of the claimant's impairments, even those that are not considered "severe."  See 20 C.F.R. §§ 416.920 and 416.945.  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 416.967(c).
[4] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. § 416.960(b)(1).

was filed.  Claimant subsequently changed age category to advanced age (20 C.F.R. § 416.963).  <u>Id.</u> at 28.

(7)  Claimant had at least a high school education and was able to communicate in English (20 C.F.R. § 416.964).  <u>Id.</u>

(8)  Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Claimant was "not disabled," whether or not Claimant had transferable job skills (<u>See</u> SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).  <u>Id.</u>[5]

(9)  Considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Claimant could perform (20 C.F.R. § 416.969 and 416.969(a)).  <u>Id.</u>

(10) Claimant had not been under a disability, as defined in the Social Security Act, since November 29, 2016, the date the application was filed. (20 C.F.R. § 416.920(g)).  <u>Id.</u> at 29.

On October 18, 2019, the Appeals Council denied a request for review of ALJ Cartledge's Unfavorable Decision.  <u>Id.</u> at 1-3.  On June 29, 2020, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Cartledge's final administrative decision [D.E. 1].

In support of his contention that ALJ Cartledge's Unfavorable Decision should be reversed, Claimant argues that:

I.    The ALJ's RFC assessment was not supported by substantial evidence.

II.   The ALJ improperly discounted the opinion of the treating psychiatrist.

III.  The ALJ failed to properly assess Claimant's testimony and credibility.

<u>See</u> Claimant's Motion for Summary Judgment [D.E. 17-1 at 3].  The undersigned finds no merit in any of these contentions.

---

[5] SSRs are a series of precedential decisions relating to the programs administered by the SSA and are published under the authority of the Commissioner of Social Security.  <u>See</u> http://ssa.gov/regulations/def-ssr.htm.

## RELEVANT MEDICAL EVIDENCE

### I.    Mental Health Providers

#### A.  Treating Sources

##### 1)  Miami Behavioral Health Center

Claimant underwent an initial psychiatric evaluation on January 21, 2016, by Maria A. Gorelick, M.D. ("Dr. Gorelick"), when he voluntarily presented at the crisis unit and stated that he had tried to hang himself a few days before. Id. at 319. He complained of depression, suicidal ideation, and anxiety. Id. He stated that he had been feeling depressed for about a year, and that he was scared, could not sleep, and did not want to do anything. Id. He denied taking past psychiatric medications. Id. He admitted to past use of alcohol and cocaine in his 20s. Id. His mental status was noted as depressed; he was oriented as to time, place, and person; his memory, thought process, and thought content were intact; and his speech was unremarkable. Id. at 321. His insight, judgment, and sleep were noted as poor. Id. He reported auditory hallucinations telling him to kill himself. Id. He was diagnosed with major depression disorder, extreme with suicidal ideation, and generalized anxiety disorder. Id. at 322. His Global Assessment of Functioning ("GAF") score was 30, and the highest it had been in the prior 12 months was 70. Id.[6] Claimant  was then admitted to the crisis stabilization unit. Id. at 323.

---

[6] "Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations." Vargas v. Astrue, No. 07-CV-60776, 2008 WL 4056164, at *3 (S.D. Fla. Aug. 25, 2008). "A GAF score of 21-30 indicates behavior that is considerably influenced by delusions or hallucinations or, serious impairment in communication or judgment or inability to function in almost all areas." Chavez v. Berryhill, No. 17-20954-CIV, 2018 WL 6261511, at *4 (S.D. Fla. Sept. 26, 2018) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders IV-TR 34 (4th ed. 2000)). "A GAF score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household)." Mathis v. Astrue, No. 3:06-CV-816-J-MCR, 2008 WL 876955, at *7 (M.D. Fla. Mar. 27, 2008) (citing Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) at 32 (4th ed.1994)).

On February 18, 2016, Claimant started treatment with psychiatrist Alejandro Urrutia, M.D. ("Dr. Urrutia").  Id. at 317.  Claimant's mental status, including his appearance, affect, mood, orientation to time/place/person, sensorium, memory, and sleep were noted as appropriate or unremarkable.  Id.  His sleep, appetite, eye contact, reliability, concentration, insight, and judgment were noted as good.  Id.  His thought process was intact, his thought content was unremarkable, he denied having hallucinations, delusions, or suicidal thoughts, and he did not have any medication side effects.  Id.  Dr. Urrutia noted that Claimant's response to treatment was well controlled.  Id. at 318.  Claimant was compliant with medication and showing improvement, and no medication change was prescribed.  Id.

Claimant saw Dr. Urrutia for a routine follow up visit on March 17, 2016.  Id. at 315.  His mental status, including his appearance, affect, mood, orientation to time/place/person, sensorium, memory, and sleep were noted as appropriate or unremarkable.  Id.  His sleep, appetite, eye contact, reliability, concentration, insight, and judgment were noted as good.  Id.  His thought process was intact, his thought content was unremarkable, he denied having hallucinations, delusions, or suicidal thoughts, and he did not have any medication side effects.  Id.  Dr. Urrutia noted that Claimant's response to treatment was well controlled.  Id. at 316.  Claimant was compliant with medication and showing improvement, and no medication change was prescribed.  Id.

Claimant saw Dr. Urrutia for a routine follow up visit on May 18, 2016.  Id. at 313.  His mental status, including his appearance, affect, mood, orientation to time/place/person, sensorium, memory, and sleep were noted as appropriate or unremarkable.  Id.  His sleep was noted as poor. His appetite, eye contact, reliability, concentration, insight, and judgment were noted as good.  Id. His thought process was intact, his thought content was unremarkable, he denied having hallucinations, delusions, or suicidal thoughts, and he did not have any medication side effects.

Id.  Dr. Urrutia noted that Claimant's response to treatment was well controlled.  Id. at 314.
Claimant was compliant with medication and showing improvement, and no medication change
was prescribed.  Id.

Claimant saw Dr. Urrutia on July 18,2016 for a treatment plan review.  Id. at 301.  Dr.
Urrutia noted that Claimant had been euthymic for the past six months.  Id.  Claimant reported that
his sleep and appetite were good; and his insight, judgment, and reliability remained good.  Id.  He
denied having any hallucinations or suicidal thoughts, and he did not have side effects to his
medications.  Id. Dr. Urrutia recommended that Claimant continue with psychiatric treatment once
every three months.  Id.  Claimant's diagnoses were major depressive disorder with recurrent
psychosis- severe with psychotic features, and generalized anxiety disorder.  Id.

Claimant saw Dr. Urrutia for a routine follow up visit on September 19, 2016.  Id. at 309.
His affect was constricted, and his mood was depressed; but his appearance, orientation to
time/place/person, sensorium, memory, and sleep were appropriate or unremarkable.  Id.  His
sleep, appetite, eye contact, reliability, concentration, insight, and judgment were good.  Id.  His
thought process was intact, his thought content was unremarkable, he denied having hallucinations,
delusions, or suicidal thoughts, and he did not have any medication side effects.  Id.

Claimant saw Dr. Urrutia for a routine follow up visit on November 11, 2016.  Id. at 307.
His mood was depressed, but his appearance, affect, orientation to time/place/person, sensorium,
memory, and sleep were appropriate or unremarkable.  Id.  His sleep, appetite, eye contact,
reliability, concentration, insight, and judgment were good.  Id.  His thought process was intact,
his thought content was unremarkable, he denied having hallucinations, delusions, or suicidal
thoughts, and he did not have any medication side effects.  Id. Dr. Urrutia noted that Claimant's

response to treatment was well controlled.  Id. at 308.  Claimant was compliant with medication and showing improvement, and no medication change was prescribed.  Id.

Claimant's medication record from February 19, 2016 through November 18, 2016 showed that he was prescribed Risperidone, Hydroxyzine, Bupropion, Zolpidem, and Paxil.  Id. at 306.

### 2) Banyan Health Systems

Thereafter, Claimant continued to see Dr. Urrutia for medication management at Banyan Health Systems.  On July 7, 2017, Claimant's chief complaints were anxiety, depression, and insomnia.  Id. at 496.  A review of systems revealed no physical complaints.  Id.  A mental status exam revealed that Claimant's appearance and affect were appropriate; his mood was euthymic; he was alert and oriented to time/place/person; his memory was intact; and his speech was unremarkable.  Id. at 497.  His sleep, appetite, eye contact, reliability, and concentration were good.  Id.  His insight and judgment were fair; his thought process was intact; and his thought content was unremarkable.  Id.  He denied having hallucinations, delusions, suicidal thoughts, or medication side effects.  Id.  His response to medical treatment was well controlled.  Id.  His medications were Paxil and Hydroxyzine; and his recommended medications were Risperidone, Bupropion, and Zolpidem.  Id.

Claimant was seen by Ruben Bembibre, ARNP ("ARNP Bembibre") on September 6, 2017 for medication refills and follow up.  Id. at 493.  Claimant's chief complaints were anxiety, depression, and insomnia.  Id.  A review of systems showed no physical complaints.  Id.  A mental status exam revealed that Claimant's appearance and affect were appropriate; his mood was anxious; he was alert and oriented to time/place/person; his memory was impaired; and his speech was unremarkable.  Id. at 494.  His sleep, appetite, eye contact, and reliability were good; and his concentration was fair.  Id.  His insight and judgment were good; his thought process was intact;

and his thought content was unremarkable.  Id.  He denied having hallucinations, delusions, suicidal thoughts, or medication side effects.  Id.  His response to medical treatment was well controlled.  Id.  His medications were Paxil and Hydroxyzine.  Id.

On September 9, 2017, Claimant followed up with Dr. Urrutia for medication management. Id. at 489.  Claimant's chief complaints were anxiety, depression, and insomnia.  Id.  Claimant stated that he took his medications and felt good.  Id.  A review of systems showed no physical complaints.  Id.  A mental status exam revealed that Claimant's appearance was appropriate; his affect was constricted; his mood was depressed and anxious; he was alert and oriented to time/place/person; his memory was intact; and his speech was unremarkable.  Id. at 490.  His sleep, appetite, concentration, insight, and judgment were fair; his eye contact and reliability were good. Id.  His thought process was intact; and his thought content was unremarkable.  Id.  He denied having hallucinations, delusions, suicidal thoughts, or medication side effects.  Id.  His response to medical treatment was not improving as expected, and Claimant was counseled on new medications.  Id.  His medications were Benadryl, folic acid, Paxil, and Hydroxyzine; and his recommended medications were Risperidone, Bupropion, and Zolpidem.  Id. at 491.

On September 27, 2017, Dr. Urrutia completed a medical source statement of ability to do work-related mental activities.  Id. at 451-53.  Dr. Urrutia opined that Claimant's impairment impacted his ability to understand, remember, and carry out instructions. Id. at 451.  He opined that Claimant had slight restrictions for: understanding and remembering short simple instructions; carrying out short, simple instructions; and ability to make judgments on simple work-related decisions.  Id.  Dr. Urrutia further opined that Claimant had moderate restrictions for: ability to respond appropriately to changes in a routine work setting; carrying out detailed instructions; and responding appropriately to changes in a routine work setting.  Dr. Urrutia further opined that

8

Claimant had marked restrictions for: understanding and remembering detailed instructions; carrying out detailed instructions; ability to interact appropriately with the public, supervisors and co-workers; and ability to respond appropriately to work pressures in a usual work setting.  Id.  Dr. Urrutia stated that Claimant was on a heavy dose of medications and still presented symptoms.  Id. at 452.  Dr. Urrutia noted that no other capabilities were affected by the impairment.  Id.

Claimant followed up with Dr. Urrutia for medication management on December 6, 2017. Id. at 485.  Claimant's chief complaints were anxiety, depression, and insomnia.  Id.  A mental status exam revealed that Claimant's appearance and affect were appropriate; his mood was euthymic; he was alert and oriented to time/place/person; his memory was intact; and his speech was unremarkable.  Id. at 486.  His sleep, appetite, eye contact, reliability, and concentration were good.  Id.  His insight and judgment were fair; his thought process was intact; and his thought content was unremarkable.  Id.  He denied having hallucinations, delusions, suicidal thoughts, or medication side effects.  Id.  His response to medical treatment was well controlled, stable.  Id. His medications were Benadryl, folic acid, Paxil, Hydroxyzine, Risperidone, Bupropion, and Zolpidem.  Id. at 486-87.

Claimant followed up with Ignacio Bobes, M.D. ("Dr. Bobes") for medication management on February 7, 2018.  Id. at 481.  Claimant's chief complaints were that he felt sad and was forgetful.  Id.  Dr. Bobes noted that Claimant complained about symptoms of depression and lack of motivation and energy, and that he had a paranoid demeanor and seemed to be responding to internal stimuli.  Id.  A review of systems revealed no physical complaints.  Id.  A mental status exam revealed that: Claimant's appearance was appropriate; his affect was constricted; his mood was depressed and anxious; he was alert and oriented to time; his memory was impaired; and his speech was unremarkable.  Id. at 481-82.  His sleep, appetite, reliability, concentration, insight,

and judgment were poor.  Id. at 82.  His thought process was intact; but he had obsessive thoughts, auditory hallucinations, and paranoid delusions.  Id.  He denied having suicidal thoughts or medication side effects.  Id.  His medications were Benadryl, folic acid, Paxil, Hydroxyzine, Risperidone, and Bupropion.  Id. at 482-83.

Claimant followed up with Dr. Urrutia on April 4, 2018.  Id. at 475.  Claimant's chief complaints were anxiety, depression, and insomnia.  Id.  Dr. Urrutia noted that Claimant displayed some grandiosity, episodes of distractibility, and mood swings; but that Claimant had no clinical evidence of psychosis and reported good compliance with medications.  Id.  Claimant was diagnosed with headaches, hypertension, and high blood pressure.  Id. at 477.  A review of systems revealed no physical complaints.  Id. at 478.  A mental status exam revealed that Claimant's appearance and affect were appropriate; his mood was euthymic; he was alert and oriented to time/place/person; his memory was intact; and his speech was unremarkable.  Id.  His sleep, appetite, eye contact, reliability, and concentration were good.  Id.  His insight and judgment were fair; his thought process was intact; and his thought content was unremarkable.  Id.  He denied having hallucinations, delusions, suicidal thoughts, or medication side effects.  Id.  His response to medical treatment was well controlled, stable.  Id.  His medications were Wellbutrin, Benadryl, folic acid, Paxil, Hydroxyzine, Risperidone.  Id. at 478-79.

Claimant followed up with Dr. Urrutia again on June 4, 2018.  Id. at 471.  Claimant's chief complaints were anxiety, depression, and insomnia.  Id.  Claimant stated that: he had depressed mood; was feeling sad part of the day; had diminished interest, difficulties with sleep, decreased energy level; and was feeling indecisive.  Id.  Dr. Urrutia noted that Claimant showed clinical evidence of psychosis as manifested by the presence of auditory hallucinations on and off.  Id.  Claimant had headaches, hypertension, and high blood pressure.  Id.  A mental status exam

revealed that Claimant's appearance and affect were appropriate; his mood was euthymic; he was alert and oriented to time; his memory was intact; and his speech was unremarkable. Id. at 472. His sleep, appetite, eye contact, reliability, and concentration were good. Id. His insight and judgment were fair; his thought process was intact; and his thought content was unremarkable. Id. He denied having hallucinations, delusions, suicidal thoughts, or medication side effects. Id. His response to medical treatment was well controlled, stable. Id. His medications were Wellbutrin, diphenhydramine, Benadryl, folic acid, Paxil, Hydroxyzine, Risperidone. Id. at 472-73.

Claimant followed up with Dr. Urrutia again on September 10, 2018. Id. at 467. Claimant's chief complaints were anxiety, depression, and insomnia. Id. Claimant stated that: he had depressed mood; he felt sad part of the day; he had diminished interest, difficulties with sleep, and decreased energy level; and he was feeling indecisive. Id. Dr. Urrutia noted that Claimant showed clinical evidence of psychosis as manifested by the presence of auditory hallucinations on and off. Id. Claimant had headaches, hypertension, and high blood pressure. Id. A mental status exam revealed that Claimant's appearance and affect were appropriate; his mood was euthymic; he was alert and oriented to time/place/person; his memory was intact; and his speech was unremarkable. Id. at 468. His sleep, appetite, eye contact, reliability, and concentration were good. Id. His insight and judgment were fair; his thought process was intact; and his thought content was unremarkable. Id. He denied having hallucinations, delusions, suicidal thoughts, or medication side effects. Id. His response to medical treatment was well controlled, stable. Id. His medications were Wellbutrin, diphenhydramine, Benadryl, folic acid, Paxil, Hydroxyzine, Risperidone. Id. at 468-69.

### B.  Non-treating Sources

#### 1)  State Agency Psychological Consultant Pamela D. Green, Ph.D. ("Dr. Green")

On May 31, 2017, Dr. Green completed a Psychiatric Review Technique ("PRT") for Claimant.  Id. at 75-77.  Dr. Green opined that Claimant had: mild difficulties in understanding, remembering, or applying information, and in adapting or managing himself; and moderate difficulties in interacting with others, and in concentration, persistence, or maintaining pace.  Id. at 75.  Dr. Green further opined that Claimant understood and could complete a questionnaire, was able to self-assess in writing, had good enough cognitive abilities, had neat handwriting, and did not give the appearance or feel of an individual struggling with psychosis.  Id.  Dr. Green noted that Claimant knew the details of the medications he was prescribed, appeared able to handle family finances, and was able to drive and shop independently.  Id. at 76.  Dr. Green concluded that Claimant had mental impairments of some severity but they were still manageable, and that Claimant was at least capable of simple routine tasks.  Id. at 77.

#### 2)  SSA Single Decision Maker James A. Brown, Ph.D. ("Dr. Brown")

On March 21, 207, Dr. Brown completed a Mental RFC Assessment for Claimant.  Id. at 62-64.  Dr. Brown opined that Claimant had the following limitations with regard to understanding and memory: his ability to remember locations and work like procedures and to understand and remember very short and simple instructions was not significantly limited; and his ability to understand and remember detailed instructions was moderately limited.  Dr. Brown explained that Claimant had some memory issues that would limit him to simple routine tasks.  Id. at 63.

Dr. Brown further opined that Claimant had the following limitations with regard to concentration and persistence: Claimant's ability to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with others

without being distracted by them, and to make simple work-related decisions was not significantly limited; Claimant's ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychosocially based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods was moderately limited. Id. at 62-63. Dr. Brown opined that if Claimant's depression continued to be well controlled, and that he should be capable of at least semi-skilled work. Id. 63.

Dr. Brown further opined that Claimant had the following social limitations: his ability to ask simple questions or request assistance, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was not significantly limited; and his ability to interact appropriately with the general public, and to accept instruction and respond appropriately to criticism from supervisors was moderately limited. Id. at 63-64. Dr. Brown opined that Claimant was likely to be less stressed if he worked in a relaxed environment with projects instead of people. Id. at 64.

## II. Physical Health Providers

### A. Treating Sources

#### 1) Dr. Jorge Acosta, M.D. ("Dr. Acosta")

Claimant submitted medical records from Dr. Acosta dated July 19, 2016 through August 21, 2018. Lab tests were performed on July 19, 2016. Id. at 428-32. Claimant saw Dr. Acosta on January 17, 2017 to review lab test results and for malaise. Id. at 433. Dr. Acosta diagnosed Claimant with essential hypertension, hyperlipidemia, and type 2 diabetes mellitus without complications. Id. at 433. Claimant's medications were amlodipine, glyburide, pravastatin, and

fenofibrate.  Id.  A review of systems revealed no pain, vomiting, nausea, limited joint mobility, joint pain, muscle pain, or muscle weakness.  Id.  Dr. Acosta noted that a full physical examination had been completed with no acute findings; and that Claimant's blood pressure was stable.  Id. at 434.

Claimant saw Dr. Acosta on January 5, 2017 and lab tests were performed.  Id. at 391. Claimant's diagnoses were type 2 diabetes mellitus without complications, hyperlipidemic, and essential hypertension.  Id.  Claimant's medications were hydrochlorothiazide, Zithromax, glyburide, Exforge, fenofibrate, and pravastatin.  Id.

Claimant saw Dr. Acosta on January 17, 2017 for malaise and lab test results.  Id. at 396. Claimant's physical exam was unremarkable.  Id.  Claimant was cooperative, in no acute distress, and alert and oriented to person, place, and time.  Id. at 396-97.  Claimant's body mass index was 30+, indicating obesity.  Id.  A complete physical examination was performed and there were no acute findings; and Claimant's blood pressure was stable.  Id.  Claimant's medications were fenofibrate, amlodipine, glyburide, and pravastatin.  Id.  Dr. Acosta advised Claimant to monitor his weight and prescribed activity and dietary management.  Id.

Claimant saw Dr. Acosta again on May 19, 2017 for hyperglycemia and lab test results. Id. at 462.  Dr. Acosta conducted a comprehensive diabetic foot exam and noted that right and left foot dorsalis pedis pulse were present, and there was no edema.  Id. at 463.  A complete physical examination was performed and there were no acute findings; and Claimant's blood pressure was stable.  Id.  A new medication, Glyxambi, was prescribed.  Id.

Claimant saw Dr. Acosta on November 11, 2017, for lab test results and because of weight gain.  Id. at 460.  Claimant's diagnoses were abnormal weight gain, along with type 2 diabetes, essential hypertension, and hyperlipidemia.  Id. at 461.  A complete physical examination was

performed and there were no acute findings; and Claimant's blood pressure was stable.  Id.  Dr. Acosta advised Claimant to monitor his weight and prescribed activity and dietary management. Id.

Claimant saw Dr. Acosta on August 13, 2018, for malaise and review of lab test results. Id. at 457.  Claimant's physical exam results were unremarkable.  Id. at 458.  Claimant was advised to continue his medical plan and monitor his weight.  Id.

On August 21, 2018, Claimant saw Dr. Acosta for review of lab test results and for fatigue. Id. at 455.  Claimant was cooperative, in no acute distress, and alert and oriented to person, place, and time.  Id. at 455-56.  Claimant's physical exam was unremarkable.  Id.  Claimant's diagnoses were abnormal thyroid, type 2 diabetes mellitus without complications, essential hypertension, and hyperlipidemia.  Id. at 456.  A complete physical exam was performed and there were no acute findings; and Claimant's blood pressure was stable.  Id.    Dr. Acosta again advised Claimant to monitor his weight and prescribed activity and dietary management.  Id.

### 2) Dr. Bianca D. Alfonso, M.D. ("Dr. Alfonso"), Endocrinology Associates P.A.

On September 17, 2018, Claimant saw endocrinologist Dr. Alfonso for an initial visit.  Id. at 501.  Dr. Alfonso reviewed Claimant's medications and medical and social history, and noted that Claimant had no known problems, no previous surgeries, and that his past medical history indicated diabetes and hypertension.  Id. at 502.  Dr. Alfonso noted that there were no recent exacerbating factors as to Claimant's diabetic control.  Id.  Claimant reported recent bilateral ankle and feet swelling.  Id.  A neurological exam revealed that Claimant had known neuropathy and felt paresthesia on and off, but he reported that he did not have foot pain or a history of diabetic foot ulcers.  Id. at 503.  Claimant reported no acute symptoms or hypoglycemic episodes, and Dr. Alfonso noted that his diabetes was under improving control.  Id. at 504.  Dr. Alfonso discussed

foot hygiene with Claimant and noted that there was evidence of diabetic peripheral neuropathy, and that Claimant's limbs were at risk.  Id.  Dr. Alfonso counseled Claimant on nutrition, and the importance of exercise and weight loss for diabetes control.  Id.

### B.  Non-Treating Sources

#### 1)   Dr. Robert Jaeger, D.O. ("Dr. Jaeger")

Claimant underwent a consultative medical examination with Dr. Jaeger on February 20, 2017.  Id. at 419.  Claimant's medical problems were identified as depression and psychosis for the past five years, and diabetes for the past seven years, with vision impairment and hypertension. Id.  Claimant reported that his medications were Ambien, Risperdal, paroxetine, and medication for diabetes.  Id.  He denied any suicidal ideations.  Id.  Claimant drove to the appointment by himself.  Id.  Claimant's pulse was 70; his respiratory rate was 18; his blood pressure was 124/78; his height was 5'6" and his weight was 210.  Id. at 420.  His vision in his left and right eye without glasses was 20/50.  Id.

Claimant appeared to be confused; he could not do memory recall forwards and backwards; and he was not orientated to day, month, year, or season.  Id.  Claimant was clean but depressed. Id.  He stated that he liked to socialize with friends and watch TV.  Id.  He had pain in the left shoulder which was relieved by rest; and he did not use a walker, cane, or brace; he could sit for 3 hours, stand for 30 minutes, walk for 1 hour, and lift 10 pounds.  Id.  He denied any respiratory, cardiovascular, gastrointestinal, genitourinary, or neurological complaints.  Id.

Claimant's physical examination did not reveal any significant findings.  Claimant's had normal range of motion of the shoulders, elbows, and wrists with 5/5 strength.  Id.  Dr. Jaeger concluded that Claimant: had a history of depression and psychosis, had been hospitalized a few times, and was on medications; had decreased sensory levels on the lower extremities, and his gait

was flatfooted but steady; his vision was decreased; and he had a history of hypertension and his blood pressure was controlled.  Id. at 421.

### 2)  SSA Single Decision Maker Karen J. Cammack ("Ms. Cammack")

On March 21, 2017, Ms. Cammack completed a Physical RFC Assessment for Claimant. Id. at 61-62.  Ms. Cammack opined that Claimant had the following exertional limitations: he could lift and/or carry up to 50 pounds occasionally and up to 25 pounds frequently; he could stand and/or walk and sit for a total of 6 hours in an 8-hour work day with normal breaks; and he was unlimited in his ability to push and/or pull.  Id.  Ms. Cammack further opined that Claimant had no postural, manipulative, visual, communicative, or environmental limitations.  Id.

### 3)  James Segal, MD ("Dr. Segal")

On May 12, 2017, Claimant underwent a consultative ophthalmological examination with Dr. Segal.  Id. at 444.  Claimant's chief complaint was trouble driving at night.  Claimant's best corrected vision was 20/40 in each eye.  Id. at 445.  Dr. Segal diagnosed Claimant with cataracts and recommended cataract surgery.  Id. at 446.

### 4)  State Agency Medical Consultant David Braverman, M.D. ("Dr. Braverman")

On June 26, 2017, Claimant underwent a physical medical evaluation by Dr. Braverman. Id. at 94.  Dr. Braverman reviewed Claimant's medical records and nonmedical evidence, and noted that: Claimant's lab results were unmarkable; Claimant had cataracts which could require surgery; Claimant had no diabetic retinopathy; and Claimant's visual impairments were less than 20% in each eye.  Dr. Braverman concluded that the physical RFC allowing for medium exertion was consistent with Claimant's medical record.  Id.

**FUNCTION REPORT**

On February 10, 2016, Claimant submitted a function report in which he stated that he used to work as a truck driver and was able to concentrate and socialize, but now he could only sleep with medication and he had no desire to do anything other than watch television and sleep. Id. at 229. He stated that he was able groom and feed himself, and he did not require reminders to take care of his personal needs or take his medicines. Id. at 229-30. He stated that he did not prepare his own meals but did not provide a reason why. Id. at 230. He was able to do household chores such as cleaning and laundry, which sometimes took him all day, and he did not need help to do these things. Id.

Claimant stated that he was able to go out alone and was able to drive a car to get around. Id. at 231. He stated that he was able to go shopping for food in stores, and was capable of paying his bills and counting change, handling a savings account, and using a checkbook. Id. He stated he enjoyed watching TV and fishing. Id. at 232.

Claimant stated that he did not have any problems getting along with family, friends, neighbors, or others, but he did not like to socialize. Id. at 233. He stated that his conditions affected his memory, concentration, understanding, and ability to follow instructions and complete tasks. Id. He stated he was able to walk a few blocks before needing to stop and rest, and that he could not follow writing or spoken instructions well. Id. He stated that his ability to get along with authority figures was normal, but his ability to handle stress or changes in routine was "not that good." Id. at 234. He stated that he feared having suicidal thoughts and often had nightmares. Id.

Claimant wore glasses, which he had done since he was a child. Id. He stated that his current medications were paroxetine, Bupropion, Risperidone, and Hydroxyzine, and that he

experienced side effects of dizziness, dry mouth, headaches, pain in the stomach, nausea, hearing voices, becoming agitated, and diarrhea.  Id. at 235.  He stated that he was also diabetic, and he took glyburide, amlodipine, and pravastatin; and that he did not know which pills were causing his side effects.  Id.

## HEARING TESTIMONY

A hearing was held on October 23, 2018, before ALJ Cartledge, at which Claimant and VE Simone testified.  Id. at 31-53.

### I.     Claimant

Claimant testified that he had previously worked as a tractor trailer truck driver, as an employee of an air conditioning company, and as a maintenance person for a hotel.  Id. at 35-37. He would occasionally have to lift over 20 pounds in his previous work.  Id. at 37.  He stated that he stopped working at the maintenance job in 2013, because of an argument with a new manager, and that he did not work after that because of his depression.  Id.  at 37-39.  He was divorced from his wife of 30 years and he currently lived with his sister.  Id. at 38.  He did not start to take medication for depression until after he was hospitalized following a suicide attempt.  Id. at 39.

Claimant stated that the reason he could not work was because he only felt much better approximately two days a week, and on the other days he did not want to talk to anyone.  Id. at 44. He stated that his sister took him to his mother's house every day because sometimes he started to feel suicidal and she did not want him to be alone.  Id.  He stated that his father and cousin both committed suicide.  Id. at 45.  He stated that he did not like driving because it made him nervous. Id. at 46-47.  He stated that he had recently seen a diabetes specialist at the urging of his sister because his lower ankles would swell if he sat or walked for too long.  Id. at 47.  He was unsure how long he could walk or remain on his feet because he had not measured it.  Id. at 48.  He stated

that he was not sure how long he would last if he were given a simple job because he did not communicate much, but he acknowledged that he did communicate with his sister and brother-in-law.  Id.  He stated that his hallucinations were "much, much better" with medications and that he took sleeping pills to help him sleep.  Id.

On a typical day, Claimant would go to his mother's house and help her with gardening or washing dishes, or he would watch TV with her.  Id. at 49.

## II.    VE Simone

VE Simone classified Claimant's prior work as follows:

➢ Tractor trailer driver, DOT #904.383-010,[7] with an exertional level of medium[8] and a Specific Vocational Preparation (hereafter, "SVP") of 4;[9]

➢ Janitor, DOT #382.664-010, with an exertional level of medium and an SVP of 3.[10]

Id. at 40.

ALJ Cartledge posed to VE Simone two hypotheticals for an individual of Claimant's age, with his education and work experience who:

1) was able to work at the medium exertional level; except that the individual could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand and/or walk with normal breaks for a total of six hours in an eight-hour day, sit with normal breaks for a total of six hours in an eight-hour workday, with no pushing or pulling limits except as otherwise shown for lifting or

---

[7] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups of jobs based on their similarities, and defines the structure and content of all listed occupations.  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[8] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 416.967(c).

[9] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM. An SVP of 4 means preparation for the job should take "[o]ver 3 months up to and including 6 months." Id.

[10] An SVP of 3 means that preparation for the job should take "[o]ver 1 month up to and including 3 months."  Id.

carrying, and limited to SVP levels 1[11] and 2[12] occupations of simple, routine, and repetitive tasks, requiring occasional interaction with the public, co-workers, and supervisors.   (Hypothetical No. 1).

2)  had the same abilities as the individual in Hypothetical No. 1; except that the individual would be off task for ten minutes per hour outside normal breaks during the workday. (Hypothetical No. 2).

Id. at 49-51.

VE Simone testified that the individual in Hypothetical No. 1 would not be able to perform all of Claimant's past work; however, VE Simone testified that the individual in Hypothetical No. 1 could perform the following jobs:

➢  Kitchen helper, DOT #318.687-010, with an exertional level of medium and an SVP of 2, with 275,000 jobs in the national economy;

➢  Cook helper, DOT #317.587-010, with an exertional level of medium and an SVP of 2, with 251,000 jobs in the national economy; and

➢  Hand packager, DOT #920.587-018, with an exertional level of medium and an SVP of 2, with 41,000 jobs in the national economy.

Id. at 54-55.

VE Simone testified that the individual in Hypothetical No. 2 would not be able to perform any jobs because typically the maximum time an individual could be off task is approximately 15%, anything in excess of that would be job prohibitive.  Id. at 55.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law." Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

[t]he Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla—i.e.,

---

[11] An SVP of 1 means that preparation for the job should take "[s]hort demonstration only."  Id.
[12] An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month."  Id.

> the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However, the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid."  Williams, 416 F. App'x at 862.

### REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Cartledge determined that Claimant had not engaged in substantial gainful activity from since November 29, 2016, the application date.  TR. 21.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  Phillips, 357 F.3d at 1237.  In this case, ALJ Cartledge found that Claimant suffered from the following severe impairments: diabetes mellitus, peripheral neuropathy, anxiety, disorder, and major depressive disorder with psychosis.  TR. 21.  ALJ Cartledge then proceeded to step three.  Id.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  Phillips, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  Id.  Here, ALJ Cartledge

determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. 21.  Therefore, ALJ Cartledge proceeded to step four.  Id. at 23.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work."  Phillips, 357 F.3d at 1238.  As to the first prong, ALJ Cartledge determined that Claimant had the RFC:

> to perform medium work as defined in 20 C.F.R. 416.967(c) except he can only occasionally (occasionally is defined as cumulatively 1/3 of less of an 8-hour workday) lift and/or carry (including upward pulling) 50 pounds and frequently (frequently is defined as cumulatively between 1/3 and 2/3 of an 8-hour workday) lift and/or carry (including upward pulling) 25 pounds.  He is able to stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday.  [He] is able to sit (with normal breaks) for a total of 6-hours in an 8-hour workday.  There are no limits regarding pushing and/or pulling (including operation of hand and/or foot controls), except as otherwise shown for lift and/or carry in this residual functional capacity assessment.  The claimant is limited to unskilled Specific Vocational Preparation (SVP) level 1 and 2 occupations of simple, routine and repetitive tasks requiring occasional interactions with the public, co-workers, and supervisors, and limited to occasional work-setting changes.

TR. 23.  Based on Claimant's RFC, ALJ Cartledge moved to prong two of step four and concluded that Claimant was not able to perform any past relevant work.  Id. at 27.  ALJ Cartledge then proceeded to the fifth and final step.  Id. at 28.

Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC.  Phillips, 357 F.3d at 1239-40.  ALJ Cartledge determined that, given Claimant's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy which Claimant could perform.  TR. 28.  Therefore, ALJ Cartledge concluded that Claimant was not under a disability,

as defined in the Social Security Act, since November 29, 2016, the date the application was filed. Id. at 29.

## DISCUSSION

As previously noted, Claimant argues that:

I.       The ALJ's RFC assessment was not supported by substantial evidence.

II.      The ALJ improperly discounted the opinion of the treating psychiatrist.

III.     The ALJ failed to properly assess Claimant's testimony and credibility.

See Claimant's Motion for Summary Judgment [D.E. 17-1 at 3].  The undersigned finds no merit in any of the contentions.

**I.       Whether ALJ Cartledge's RFC finding is supported by substantial evidence.**

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  SSR 96-8p.[13]  Further, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  Id.  "In all events, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'"  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (alterations omitted) (quoting Foote v. Chater, 67 F.3d 1553,

---

[13] SSR 96-8p sets forth the SSA's policies and policy interpretations regarding the assessment of a claimant's RFC.  SSR 96–8p, 1996 WL 374184 (July 2, 1996).  According to this policy interpretation, the Commissioner is required to consider all relevant evidence in the case record in making the RFC determination.  Id.; see also Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) ("The [RFC] is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.") (citing 20 C.F.R. § 404.1545(a)).

1561 (11th Cir. 1995)).  The ALJ's "opinion must describe his analysis with enough detail to satisfy a reviewing court that he gave all of the relevant evidence before him its due regard." Turner ex rel. Turner v. Barnhart, 377 F. Supp. 2d 1165, 1168 (M.D. Ala. 2005).  When substantial evidence supports the ALJ's decision, it must be affirmed.  Strickland v. Comm'r of Soc. Sec., 516 F. App'x 829, 831 (11th Cir. 2013) ("We may not reweight the evidence and decide facts anew and must defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against it.") (citing Dyer, 395 F.3d at 1210).

Claimant argues that ALJ Cartledge failed to account for Claimant's moderate limitations in the areas of concentrating, persisting and maintaining pace in his RFC assessment and in his hypothetical question to the VE.  See Claimant's Motion for Summary Judgment [D.E. 17-1 at 13].  Although ALJ Cartledge's RFC assessment limited Claimant to unskilled occupations requiring simple, routine, and repetitive tasks and occasional interactions with co-workers, supervisors, and the public, and occasional work-setting changes, Claimant argues that these limitations are insufficient.  Id. at 16.  Claimant relies on Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176 (11th Cir. 2011), in arguing that his moderate limitations as to concentration, persistence, or pace should have been explicitly included in the hypothetical question posed to the VE.  Id. at 1180.  However, in Winschel, the Eleventh Circuit clarified that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations."  Id.; see also Neefe v. Comm'r of Soc. Sec., 531 F. App'x 1006, 1007 (11th Cir. 2013) ("Since the ALJ determined that the medical evidence demonstrated that [Claimant] could engage in simple tasks, despite moderate limitation in concentration, persistence, and pace, the ALJ sufficiently accounted

for such impairments, implicitly, by limiting the hypothetical that was posed to the vocational expert to include only simple tasks or unskilled work.").

ALJ Cartledge conducted a detailed discussion and analysis of Claimant's medical record, id. at 24-27, which supports the ALJ's finding that Claimant could perform unskilled work. Further, ALJ Cartledge noted that Claimant's mental health records from January 13, 2017 through February 18, 2018 consistently showed that Claimant's metal status exam findings were, for the most part, benign.  Id. at 25.  Indeed, Dr. Urrutia repeatedly noted that Claimant was stable on his medications: his concentration was good; and he denied having any hallucinations, suicidal ideations, or medication side effects.  Id. at 307, 309, 311, 313, 315, 317, 468, 472, 478, 486, 497. ALJ Cartledge gave great weight to Dr. Urrutia's opinion that Claimant had only slight functional limitations in the ability to understand, remember and carry out short, simple instructions and to make judgments on simple work-related decisions.  Id.  at 27.

ALJ Cartledge also gave great weight to the State agency psychologists' opinions that Claimant was able to perform simple routine tasks, and that he would work well with projects and not people, which was consistent with Claimant's report that he got along well with others in general, but he had no desire to socialize.  Id.  Specifically, Dr. Green concluded that Claimant had mental impairments of some severity, but they were still manageable, and Claimant was at least capable of simple routine tasks.  Id. at 77.  Moreover, Dr. Brown opined that if Claimant's depression continued to be well controlled, he should be capable of at least semi-skilled work.  Id. at 63.

Substantial evidence in the medical record supports ALJ Cartledge's findings that Claimant could perform simple routine tasks despite his limitations in concentration, persistence, and pace. Therefore, ALJ Cartledge's hypothetical to VE Simone sufficiently accounted for Claimant's

limitations in concentration, persistence, and pace as they were implicitly included.  Neefe v. Comm'r of Soc. Sec., 531 F. App'x 1006, 1007 (11th Cir. 2013) ("Since the ALJ determined that the medical evidence demonstrated that [Claimant] could engage in simple tasks, despite moderate limitation in concentration, persistence, and pace, the ALJ sufficiently accounted for such impairments, implicitly, by limiting the hypothetical that was posed to the vocational expert to include only simple tasks or unskilled work.").  Based on the foregoing analysis, the undersigned finds no merit in Claimant's first argument.

## II.   Whether the ALJ improperly discounted the opinion of the treating psychiatrist.

"The ALJ must consider medical opinions together with relevant evidence in the record." Hand v. Soc. Sec. Admin., Comm'r, No. 18-14147, 2019 WL 4447206, at *3 (11th Cir. 2019) (citing 20 C.F.R. § 404.1527(b)).  When weighing medical opinions, "the ALJ should consider the following factors: the examining and treatment relationship between the claimant and doctor; the supportability and consistency of the opinion with the record as a whole; the specialization of the doctor; and other factors that tend to support or contradict the opinion."  Hand, 2019 WL 4447206, at *3 (citing 20 C.F.R. § 404.1527(c)).

"Generally, a treating source's opinion is given 'substantial or considerable weight unless good cause is shown to the contrary."  Lara v. Comm'r of Soc. Sec., 705 F. App'x 804, 811 (11th Cir. 2017) (quoting Lewis, 125 F.3d at 1440).   Good cause exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips, 357 F.3d at 1241 (citing Lewis, 125 F.3d at 1440).  "If the ALJ gives less than controlling weight to a treating source's opinions, the ALJ must clearly articulate the reasons for doing so."  Lara, 705 F. App'x at 811.  "When the ALJ has articulated specific reasons for failing

27

to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error." Weekley v. Comm'r of Soc. Sec., 486 F. App'x 806, 808 (11th Cir. 2012) (citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

ALJ Cartledge assigned "great weight" to the portion of Dr. Urrutia's Mental Medical Source Statement where he opined that Claimant had slight functional limitations in the ability to understand, remember, and carry out short instructions and to make judgments on simple work related decisions, and moderate limitation in the ability to respond appropriately to changes in a routine work setting. TR. 27. However, ALJ Cartledge discounted the portion of Dr. Urrutia opinion where he opined that Claimant had marked limitations in interacting appropriately with supervisors, co-workers, and the public because they were not bolstered by the evidence and were inconsistent with the doctor's own medical records. Id. ALJ Cartledge explained:

> However, little weight is accorded to the portion of his opinion indicating the claimant had marked limitations in interacting appropriately with supervisions, co-workers and the public because in a function report, the claimant reported he does not have difficulties getting along with his family, friends or neighbors, but indicated he does not socialize much, and he gets along with authority figures.

Id.

Furthermore, as stated above, ALJ Cartledge gave great weight to the State agency psychologists' opinions that Claimant was able to perform simple, routine tasks and that he would work well with projects and not people. Id.

Because ALJ Cartledge showed good cause for discounting the portion of Dr. Urrutia's opinion regarding Claimant's ability to interact appropriately with others, and his determinations were sufficiently supported by substantial evidence, there is no error in ALJ Cartledge's weighing of Dr. Urrutia's medical opinions. Strickland, 516 F. App'x at 831.

### III.    Whether the ALJ failed to properly assess Claimant's testimony and credibility.

When considering a claimant's symptoms, the ALJ must follow a two-step process: "Step one is to determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms."  Contreras-Zambrano v. Soc. Sec. Admin., Comm'r, 724 F. App'x 700, 703 (11th Cir. 2018) (citing SSR 16-3p, 82 Fed. Reg. 49,462, 49,463-64 (Oct. 25, 2017)).  "Step two is to evaluate the intensity and persistence of an individuals' symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities."  Contreras-Zambrano, 724 F. App'x at 703 (citing SSR 16-3p, 82 Fed. Reg. at 49,464-66).  "An ALJ considers whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [her] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]."  20 C.F.R. § 404.1529(c)(4).  SSR 16-3p, effective October 25, 2017, clarified that "subjective symptom evaluation is not an examination of an individual's character."  82 Fed. Reg. at 49,463.

In his Unfavorable Decision, ALJ Cartledge stated:

> [T]he claimant testified that he is unable to work because he only feels better twice a week and the rest of the week he does not want to talk to anyone and he does not feel right with the medications he takes.  However, he admitted that the psychotropic medications he takes do help to keep him calm and has alleviated his psychotic symptoms, but not completely.  The claimant testified he had tried to commit suicide by overdosing in the past and was hospitalized.  The claimant further testified that he was diagnosed with diabetes and is now on insulin.  He testified that if he sits too long his ankles swell and he has to elevate his legs.  He testified he is not able to do any heavy lifting.  He testified he did not know how far he could walk because he is always in the house.

TR. 24.

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged

symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision . . . .

Id. at 26–27.  ALJ Cartledge supported his finding by citing to record evidence and Claimant's own testimony indicating that: he was able to prepare simple meals and do chores such as cleaning and laundry; he did not require special reminders to care for his personal needs and hygiene or to take his medications; he was able to get along with authority figures and he did not have difficulties getting along with his family, friends or neighbors; he was able to go to the grocery store to buy food; he was able to count change, pay bills and handle a bank account; he was able to drive and go out alone which the ALJ noted required substantial attention and concentration, understanding, remembering and carrying out complex functions, and was a substantial exercise in independent judgment; and his medical records from Miami Behavioral Health Centers showed that he had intact memory and fair to good concentration.  Id. at 22-23.

Because ALJ Cartledge supported his findings regarding Claimant's allegations of the intensity, persistence, and limiting effects of his symptoms with substantial evidence, there is no error in the ALJ's assessment of Claimant's alleged pain and limitations.  See Strickland, 516 F. App'x at 831.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 17] be DENIED, the Commissioner's Motion for Summary Judgment [D.E. 22] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E.

Martinez, United States District Judge.  Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal.  See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 22nd day of December, 2020.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:     United States District Judge Darrin P. Gayles
        Counsel of Record